## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

**ARNOLD McALLISTER,**

      **Plaintiff,**

**vs.**　　　　　　　　　　　　　　　**Case No. 2:14-cv-403-FtM-29CM**

**LEE COUNTY, FLORIDA BOARD OF**
**COUNTY COMMISSIONERS, etc.,**

      **Defendant.**

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, LEE COUNTY, FLORIDA BOARD OF COUNTY COMMISSIONERS ("Defendant" or "County"), moves for summary judgment on all Plaintiff's remaining claims.

## MEMORANDUM OF LAW

In this action, Plaintiff claims that Defendant retaliated against him for engaging in protected activity under the First Amendment and the False Claims Act (FCA). There is no evidence to support these claims. Instead, Plaintiff was terminated as part of a reduction-in-force that eliminated the pilot positions when the MedStar program was suspended. Plaintiff cannot establish any protected activity under the First Amendment or the FCA. Likewise, he cannot establish any causal connection between his alleged protected activity and his termination. Indeed, all other pilots were terminated with Plaintiff in this reduction-in-force, even though they did not engage in any protected activity. The shutdown also impacted the employment of many other individuals who did not engage in protected activity. Further, the County terminated the employment of the chief pilot and director of operations, even though they did not engage in protected activity. In short, Plaintiff's employment was terminated because the County decided to suspend and terminate its MedStar program. Plaintiff's termination has no connection to any

alleged protected activity, and there is no evidence to support any allegation to the contrary.

I.    **STATEMENT OF UNDISPUTED FACTS**[1]

    A.    **Structure of the MedStar Program**

The Medstar program was part of the Lee County Department of Public Safety.[2]   (KD ¶ 4; PX3:2).   From 2009 to 2012, John Wilson, the Public Safety director, reported to Holly Schwartz, an assistant county manager, who, in turn, reported to the County Manager, Karen Hawes. (KD ¶ 5; PX3:3).   The purpose of the program was to reduce the response time for certain emergency medical incidents and to provide rapid transport of critically ill and injured persons as well as support in search and rescue operations.   (KD ¶ 4; PX3:2).   For most of the time during 2009 to 2012, the County owned two helicopters, but only operated one at a time. (KD ¶ 8).   The helicopter was staffed with two critical care flight paramedics and one pilot/EMT.[3]   (PX3:2).   In April 2010, Kim Dickerson became the Chief of EMS and Deputy Director of Public Safety.   (KD ¶ 3; Pl. 40). Dickerson thereafter began overseeing, in part, the Medstar program, and she reported to Wilson. (KD ¶¶ 3, 5).   In September 2010, Robert Fulton, the chief pilot, was promoted to the position of director of flight operations for MedStar,[4] and he reported to Dickerson.   (KD ¶ 6; PX3:3).   He continued to hold the position of chief pilot and supervised the pilots.[5]   (KD ¶ 6).   On January 12,

---

[1] Defendant's supporting materials are attached, along with an index.  Defendant cites to Plaintiff's deposition by using "Pl." along with a pinpoint citation.  It cites to Kim Dickerson declaration by the designation "KD" along with a pinpoint citation.  Furthermore, it cites to exhibits to Plaintiff's deposition with the designation "PX__:____" with the pinpoint citation.  It cites to Plaintiff's Initial Disclosures as "Pl. Discl." and Plaintiff's answers to interrogatories as "Pl. Ans. __" along with pinpoint citations.  The facts recited herein are for purposes of summary judgment only.  Defendant reserves the right to challenge Plaintiff's assertions should this Motion be denied.

[2] The MedStar program initially operated under part 91 of the FAA regulations and did not separately bill for its services.  (Pl. 28-30).  Thereafter, in 2005, the County moved to a part 135 certificate under the FAA regulations, which allowed it to bill for the air ambulance services.  (Pl. 28-29; PX3:2).  Lee County was the holder of this certificate, and John Wilson was listed as the president.  (Pl. 43).  When a new helicopter is added to the fleet, the helicopter needs to be certified under part 135 and then the pilots had to be trained and certified before the County could received its final part 135 certificate from the FAA.  (Pl. 50-51).

[3] MedStar also employed two mechanics to maintain the helicopters.  (PX3: 8).

[4] Rick O'Neal was the previous chief pilot and director of operations.  (Pl. 27).  In 2007, the FAA directed the County to split the director of operations and chief pilot into two positions.  (Pl. 32-33).  As a result, the County hired Fulton as the chief pilot and O'Neal retained the director position.  (Pl. 27-28, 32-33).

[5] At the time, there were four pilots:  Plaintiff, Ricky Tackett, Andy McFarlane, and Rick O'Neal.  (KD ¶ 6; Pl. 26).

2012, Bob Buss was hired as the chief pilot when the FAA, once again, required the County to split the positions of chief pilot and director of operations.  (KD ¶ 7; Pl. 135).  Buss reported to Fulton.  (KD ¶ 7; Pl. 26).  Buss held the chief pilot position until he was terminated on June 7, 2012.  (KD ¶ 7).  Fulton held the position of director of operations until August 21, 2012 (Id.).

## B.     Plaintiff's Employment

Plaintiff began his employment with Lee County on January 10, 2002, as a pilot.  (Pl. 18).  When Plaintiff was hired, he also was required to obtain his state EMT certificate, although he did not serve as an EMT on any County-operated ground ambulance.[6]  (Pl. 25-26; KD ¶ 13).  Plaintiff's role was to fly the helicopter, not patient care.  (Id.).  Indeed, Plaintiff was permitted to perform his duties as a pilot while he was obtaining his state EMT certification.  (Pl. 26).

In addition to being a line pilot, Plaintiff also served as the only company instructor and FAA-designated check airman.  (Pl. 55).  Plaintiff contends that he agreed to serve as the company instructor for MedStar.  (Pl. 60).  He had experience as a company instructor, and, he asserts that he was acceptable to the FAA who, according to Plaintiff, "was more than willing to sign [him] off to be the instructor on that aircraft [Bell 430] as well."  (Pl. 60).  In addition, as part of these job duties, Plaintiff asserts that he would conduct a base audit and create a list of deficiencies on a quarterly basis.[7]  (Pl. 148). In addition, Plaintiff contends that, as the FAA-designated check airman, he was expected to call the FAA and talk about issues involving the County's operations.  (Pl. 151).

## C.     2009 Accident Involving the MedStar Helicopter

---

[6] To be employed as an EMT, the individual must receive his credentials from the County's medical director.  (KD ¶ 14; Pl. 200-01).  The credentialing process requires that the individual spend time with a field training officer and the officer must certify that the individual has met certain required goals and objectives.  (KD ¶ 14).  Then, the individual must pass an oral board examination before the medical director, and, thereafter, the medical director must decide to provide credentials to the individual.  (KD ¶ 14; Pl. 201-02).  Only then can an individual be employed as an EMT for the County.  (Id.).  Plaintiff never received his clinical credentials from the County's medical director.  (KD ¶ 15).  While Plaintiff states that it was his understanding that he received these credentials, he presents no evidence to support his belief.  Indeed, his belief is mistaken.  (KD ¶ 15).  Plaintiff admitted that he was not permitted to drive the ambulance. (Pl. 202).  In addition, during the safety stand down, when the MedStar helicopters were grounded, he only served as a third person on the ambulance crew because they did not have credentials. (Pl. 199-200; KD ¶ 15). The flight paramedics, on the other hand, were required to receive their credentials from the medical director.  (KD ¶ 15).

[7] Fulton also specifically asked Plaintiff to perform this job duty.  (Pl. 148).

On August 17, 2009, one of the Medstar helicopters (EC145) crashed into the water off of Captiva Island.  (KD ¶ 9; Pl. 34-35).  All of those on board survived.[8]  (Pl. 35).  The EC145 was damaged beyond repair.  (Pl. 35).   At this time, O'Neal was still the director of operations, and Fulton was the chief pilot.  (Pl. 35).  The County still had use of one helicopter, the BO105, and it continued to operate the service with that helicopter.  (Pl. 35-36).

The County next considered how to replace the EC145, and there was no shortage of opinions and little agreement among the MedStar staff.  Without authority to do so, O'Neal set expectations with the pilots and flight paramedics that the County would be purchasing a new helicopter, opined how the County could pay for the helicopter, and led discussions for over a year regarding what the pilots and paramedics would want in a new helicopter.  (Pl. 37-38, 46; KD ¶ 10).  O'Neal set the expectation with the pilots and the paramedics that this decision was a foregone conclusion.  (Id.).   O'Neal also engaged Plaintiff in conversations about obtaining a "bridge helicopter," which would have been a used helicopter that the County could use until a new helicopter was completed.[9]  (Pl. 48).  The discussions about obtaining a new helicopter ceased when O'Neal stepped down as director of operations on August 12, 2010.  (Pl. 44, 48; KD ¶ 11).

**D.     The Angst and Discord Within the Program Jeopardized Safety**

When Wilson explained that the insurance proceeds would not be used to purchase a new helicopter, the pilot were surprised and upset.[10]  (Pl. 38-39).  Due to the financial constraints of the

---

[8] Plaintiff was not involved in this accident.  (Pl. 34-35).  Diana Tackett was the pilot in charge of the aircraft.  (Pl. 44).  Plaintiff contends that Diana Tackett was offered a position as an EMT in 2009 (Pl. 45, 206); however, he admits that he does not have personal knowledge of that offer.  (Pl. 260-61).  He contends that O'Neal told him that he made this offer to her.  (Pl. 261).  O'Neal, however, was not employed at the time that the Medstar program was suspended and the pilot positions eliminated.  (KD ¶ 11).  Moreover, Plaintiff admits that Tackett never transferred to an EMT position and she never returned to work.  (Pl. 45, 206).

[9] Plaintiff explained that the "bridge helicopter" is one that was "already medically configured that would meet our requirements that we could fly as a bridge until we acquired the new helicopter."  (Pl. 48-49).   Plaintiff even elected to attend a helicopter convention, despite the County's refusal to approve this expense, to obtain information on helicopters that could be used as a "bridge helicopter."  (Pl. 48-49).

[10] Plaintiff asserts that they were "frustrated as the glib attitude that they didn't earmark the money and cavalier attitude in which it was delivered to us that it just wasn't earmarked."  (Pl. 40).  According to Plaintiff, the pilots believed this decision "lack[ed] the understanding of aviation and of what we considered an important lifesaving program."  (Pl. 40).

County, the Board decided to replace the EC145 with a used one (Bell 430) instead of a new aircraft on October 26, 2010.  (KD ¶ 12; Pl. 49).  Even though this aircraft was one of the ships proposed by Plaintiff as the "bridge helicopter," and thus, it met the County's needs,[11] he and the other pilots objected to this decision.  (Pl. 37, 48-50).  They complained that they were not included in the decisionmaking process and were not aware of the negotiations.[12]  (Pl. 41).

Additionally, after this decision, Plaintiff admits that he was no longer able to get along with Fulton, even though they had previously been friends.  (Pl. 62-63, 64, 65).  Plaintiff recounts several arguments that he had with Fulton, which he describes as "explosive episodes," and admits that they had a contentious relationship.[13]  (Pl. 55-58, 61).  Plaintiff also admits that O'Neal and Fulton frequently argued.  (Pl. 64-65).  Plaintiff contends that the Bell 430 decision started the deterioration of the relationship between Plaintiff (as well as the other pilots) and Fulton.  (Pl. 54, 64-65).  Plaintiff admits that Fulton viewed the pilots are argumentative, and there were many arguments between the pilots and Fulton during this time.  (Pl. 61-62, 95-97).  Plaintiff contends that Fulton was angry and resentful with him because Plaintiff still worked for Brainerd Helicopter after Brainerd fired Fulton.[14]  (Pl. 256).

According to Plaintiff, the pilots were supposed to have regular quarterly meetings with Fulton to discuss issues including safety matters.  (Pl. 59).  Thus, the pilots attended and participated in these meetings as part of performing their job duties.  (Pl. 59, 61; KD ¶ 16).  Plaintiff requested that Wilson attend one of the meetings in May 2011, which he did.  (Pl. 59-60).  Plaintiff admits that there was some animosity displayed in the meeting and that the pilots were expressing a lot of angst and aggravation.  (Pl. 67, 77, 97-98).  He also admits that he had a difficult time getting

---

[11] The County also invested significant resources in an extensive upgrade of the avionics.  (PX3:2; Pl. 51).

[12] As further evidence of the mistrust within the department, Plaintiff contends that, by the time he learned about the purchase, "the mechanics ha[d] been up there secretly working on the helicopter for weeks before that."  (Pl. 65).

[13] One of these arguments occurred when Fulton was flying the Bell 430 with Plaintiff from Oregon to Florida after the County purchased it.  (Pl. 57-58).

[14] This admission negates any claim that Fulton's action was based on his purported protected activity.

along with Gregory Schiegner, the director of maintenance.  (Pl. 75-76).

Wilson asked Plaintiff to compile a list of the issues and concerns raised at this meeting, which Plaintiff did.  (PX1; Pl. 72).  In this e-mail, Plaintiff admits that there had been strife in the department since the accident.  (PX1; Pl. 72).   Plaintiff then explained that the issues on the table were cockpit resource management (CRM)[15] and the use of paramedics in the cockpit.  (PX1; Pl. 72).   Plaintiff asserts that his specific concern was that the pilots were not included in the discussion, but that they were simply informed of the decision.  (Pl. 71, 72-73; PX1).  Plaintiff did not raise any safety concerns or billing issues.  (PX1). Both before and after Plaintiff sent this e-mail, Fulton expressed his concerns about the pilots' attempts to control the operations and about the safety of the MedStar program.[16]  (PX1; KD Ex. 1, 2).

### E.     A Safety Stand Down Was Implemented to Focus on Safe Operations

As a result of these reports, Wilson and Dickerson were concerned that this discord and animosity would lead to distraction and jeopardize the safe operation of the program.  (KD ¶ 17; Pl. 86, 87).  As a result, they ordered a safety stand down and ceased flight operations of the MedStar program on June 22, 2011.  (KD ¶ 18; Pl. 78, 83, 86-87).  The purpose of the safety stand down was to allow the department a period of time to focus on safety, resolve the animosity and discord in the department, and reset the program.[17]  (KD ¶ 19; Pl. 86, 87).

The safety stand down was scheduled for five weeks.  (Pl. 84).  During the safety stand down, the County required the MedStar staff to engage in activities where they discussed the issues

---

[15] Cockpit resource management (CRM) was a recommendation of the FAA that aviation companies, including MedStar, would implement to encourage all members of the flight crew, including the medics, to speak up and advocate about safety and other issues during the flight.  (Pl. 68; PX1).

[16] Specifically, on May 3, 2011, Fulton reported that the pilots believed that they should dictate the operations and he opined that he "cannot see how we can advance safely with this kind of defiance and total lack of trust on both sides." (KD Ex. 1).  On May 10, 2011, he reported that "these constant reactions are unhealthy and unreasonable behavior and are jeopardizing the willingness of 'people with a normal outlook' to stay here at all."  (KD Ex. 2).

[17] Plaintiff admits that the line staff and management were not getting along at this time, and all of the pilots, but Plaintiff, refused to work with Fulton.  (Pl. 89).  The pilots believed that Fulton was completely at fault for this breakdown in their relationship.  (Pl. 90-91).

with the program, the mission statement, and the future of the program.  (Pl. 84).  The Medstar staff, including Plaintiff, were required to participate in these meetings.  (Pl. 84).  The County also required the MedStar staff to meet with various consultants and discuss their views, including PRISM, an aviation consultant.  (Pl. 84-85).

After conducting an evaluation of the Medstar program, PRISM created a report.  (PX3). This report confirmed Wilson's and Dickerson's safety concerns.[18]  (PX3).  PRISM concluded that "the rank and file of the EMT and Pilot group was increasingly 'acting out' and committing acts reflecting a loss of operational and safety focus."  (PX3:4).  It concluded that the "most significant contributor to the decline of standards, safety, and operational effectiveness" was O'Neal as the director of operations.[19]  (Id.).  It concluded that the current management is now "hands on" and engaged, and Fulton is working cooperatively with management to change the culture and improve operations.  (Id.).  It concluded that the safety stand down "is a well organized plan to 'reboot' the organization to improve the safety culture and increase operational standards."  (PX3:6).  Plaintiff does not dispute that PRISM's conclusions are accurately represented in the report.  (Pl. 112-13; PX3).  Likewise, he does not dispute that there were significant safety concerns involving the MedStar program.  (Pl. 112-13).  At the conclusion of the safety stand down, Fulton reminded the pilots that it was part of their job duty to communicate their concerns.[20]  (PX2).

**F.    Plaintiff's Conduct Deteriorated After the Safety Stand Down**

---

[18] PRISM determined that "[t]he purchase, inspection, modification, and delivery of the new Bell 430 have been a source of strife."  (PX3:5).  It noted that much of the "acting out" of the pilots related to these decisions, and the pilots behavior led to the safety stand down, which PRISM noted was unusually long.  (Id.).

[19] PRISM found that O'Neal's argumentative style impacted the County's relationship with the FAA, which has been characterized as hostile, argumentative, and threatening, and this impact continued through 2011, resulting in a continuing strained relationship between the County and the FAA.  (Id.).  It observed that even routine tasks were difficult to get accomplished with the FAA due to this strained relationship.  (PX3:5).  PRISM noted that O'Neal stepped down to a line pilot position, but that "[t]he style and tactics [O'Neal] employed in his management position seem to have continued as a line pilot."  (PX3:4).  It noted that the "malicious nature of [O'Neal's] behavior has spread throughout the workforce including all the pilots and the Paramedic staff."  (Id.).  As a result, PRISM found that the safety culture was nonexistent and the safety status is hazardous.  (Id.).

[20] After the safety stand down, O'Neal retired, and Tracy Edmonson was hired.  (Pl. 135).  According to Plaintiff, she was supposed to be the company instructor and check airman, but she refused to perform those duties.  (Pl. 135).

On August 29, 2011, Plaintiff contends that Fulton placed him on paid administrative leave for about a month, and he was required to meet with Dr. Bushman to conduct a review of his fitness-for-duty.[21]  (Pl. 100-02, 114; PX4).  Once Dr. Bushman opined that Plaintiff was fit for duty, he was returned to work. (Pl. 102-03).  When Plaintiff returned to work, he met with Dickerson who reviewed Plaintiff's performance improvement plan (PIP) with him.   (Pl. 102-03).   The PIP indicated that his performance would be monitored for the next 12 months to ensure that he was meeting performance standards and he was warned about his unacceptable behavior in the workplace.[22]   (PX5; Pl. 102-03). As part of the PIP, Plaintiff was required to attend several mandatory training sessions, including training on how to deal with conflict, and he was required to attend follow-up sessions as recommended by Dr. Bushman.   (PX5).   In response, Plaintiff requested to have the duties of company instructor and FAA-designated check airman reassigned, but his request was denied.[23]  (Pl. 115-17, 140; PX7).

Prior to the administrative leave and PIP, Plaintiff had not spoken to the press about any issues or concerns involving the MedStar program.  (Pl. 208).  Plaintif also admits that he had not had any communications with the FAA regarding the County, and he did not report any possible FAA violation to MedStar management until April 30, 2012.  (Pl. 144, 153-54, 195).  Shortly after the PIP was administered, Plaintiff had a lengthy conversation with Mike Hamel, the lieutenant who supervised the flight paramedics.  (Pl. 127; PX6). In this conversation, Hamel reported that Plaintiff "then proceeded to unleash a seri[es] of unorganized thoughts, bouncing from topic to topic," which

---

[21] Specifically, Plaintiff was required to undergo this examination based on his conduct, which Fulton reported as erratic, unfocused, angry, obsessively repeating stories, refusing to make eye contact, and appearing on the verge of tears or an emotional breakdown.  (KD ¶ 21).  During this leave, Plaintiff spoke to Dickerson who told Plaintiff that she was not trying to terminate him.  (Pl. 105).

[22] Plaintiff admits that he might have appeared argumentative, especially in his performing his FAA-designated check airman duties.  (Pl. 132-33).

[23] Plaintiff did not complain about administrative leave and the PIP to Wilson or anyone in County Administration, and he did not grieve it under the CBA with the Union.  (Pl. 127).

included many old issues.[24] (PX6). As a result, on October 27, 2011, Fulton noted that Plaintiff's progress had been unsatisfactory. (PX8). However, instead of terminating his employment, Fulton coached Plaintiff to improve his performance. (Pl. 137-38; PX8). By the end of 2011, Plaintiff admits that he still had not had any specific conversations with the FAA. (Pl. 144).

### G. The County Mistakenly Starts Billing for the Bell 430 Flights

On February 9, 2012, Fulton informed the MedStar staff that the Bell 430 is now on the part 135 certificate with Buss listed as the chief pilot.[25] (PX10; Pl. 144, 147). He noted that the next step was to train the pilots for their check rides with the FAA and then they will be back in business. (PX10; Pl. 144-45). Hamel, who supervised the paramedics, mistakenly interpreted the e-mail to mean that the County had received the final part 135 certificate and could begin revenue flights. (PX10; KD Ex. 3, 6). He contacted David Kainrad and instructed him that the vendor should begin billing for the Bell 430 flights. (KD Ex. 6). Unfortunately, Kainrad did not confirm this instruction with Wilson or Fulton. (Id.). Thus, due to this miscommunication, the County started billing for flights made in the Bell 430 helicopter on February 9, 2012.[26] (KD ¶ 26). This billing ceased on May 25, 2012. (Id.). On September 6, 2012, Kainrad informed Schwartz, Wilson, and Dickerson of this billing mistake.[27] (KD Ex. 6).

Plaintiff admits that he never made any complaint about billing. (Pl. 223). According to Plaintiff, he "didn't see any billing, so [he] didn't deal with billing." (Pl. 223). He contends that he

---

[24] Hamel explained to Plaintiff that he was in a similar situation in July 2010 when he had to make a decision about his future at Lee County. (PX6). Hamel informed him that he recommitted to the new leadership and re-engaged with the program. (PX6). Hamel told Plaintiff that "it would be in his best interest to do the same and that if he was unable to work within the new boundaries and expectations (recently prescribed in his PIP) that he should 'seriously consider separating employment from Lee County.'" (PX6). Hamel told Plaintiff that the "O'Neal days are over" and that he "could learn to work within the new leadership or be miserable trying to fight it." (PX6).

[25] Plaintiff was on vacation during the month of February, 2012. (Pl. 147).

[26] In addition, after the suspension of the MedStar program, on September 25, 2012, the County discovered that the vendor made a billing error when it started billing for the Bell 430 before receiving authorization from the County to do so. (KD Ex. 7: 5, 16). There is no evidence, nor any suggestion, that anyone at the County was aware of this billing, including Plaintiff, until it was reported by the vendor on September 25, 2012.

[27] He confirmed that it was, in fact, a mistake due to a miscommunication, and he stated "I sincerely apologize for the misinformation that has been provided. I'll take blame for the issue at hand and the subsequent consequences that may follow from the News Press story." (KD Ex. 6).

"had expressed concerns that they were going to bill and it was going to be illegal." (Pl. 223). Fulton responded they were not going forward with billing until they met all of the requirements. (Pl. 223). He also asserts that, as a company instructor, he explained the requirements necessary in order for the County to bill. (Pl. 60, 223, 252). Plaintiff does not assert and he cannot identify any time when he complained that the County was billing improperly. (Pl. 223, 252). Indeed, he admits that he did not have the knowledge to make this complaint. (Pl. 60, 223).

### H. Fulton Continues to Counsel Plaintiff Regarding His Performance

On March 1, 2012, Fulton, Buss, and Scott Tuttle met with Plaintiff to provide another follow-up to his PIP. (PX9; Pl. 140). While Fulton opined that Plaintiff still had not improved his performance and was defensive, derisive, saracastic, and insubordinate during this meeting, Fulton did not terminate Plaintiff and tried to coach him to improve his conduct. (PX9). Plaintiff admits that these were Fulton's perceptions, and he concedes that he was argumentative with him and continued to have difficulty getting along with him. (Pl. 139, 141). By this time, Plaintiff still had not had any communications with the FAA. (Pl. 149-50).

By May 9, 2012,[28] Plaintiff's performance still had not improved, but neither Fulton nor Buss terminated his employment. (Pl. 170; PX15: 1). Instead, they again tried to coach him to improve his performance, and continued him on a revised PIP. (Id.). Buss did note that Plaintiff had received satisfactory performance evaluations, and these same performance deficiencies were noted in those evaluations. (PX15: 1). Plaintiff contends that the PIP was revised due to a change in training courses, and he did not view this revised PIP as changing anything. (Pl. 171, 173).

### I. Plaintiff's Grievance About Job Duties and Hostile Work Environment

On March 29, 2012, Plaintiff sent an e-mail indicating that he wanted to "officially fil[e] a grievance with the county concerning the terms of [his] employment," alleging that he was being

---

[28] The decision to revise Plaintiff's PIP was made in early April. (KD ¶ 23; Pl. 171-72).

required to perform the duties of company instructed and FAA-designed check airman in violation of the collective bargaining agreement (CBA) between the County and the Union.  (PX12:3; Pl. 162).  In this grievance, Plaintiff asserted that "an extremely hostile environment has been created for me personally and professionally and [he] will not be performing these 'additional duties' any longer." (PX12:3).  Plaintiff had been told that he must continue to perform these duties over his objection.  (Id.).  Wilson offered Plaintiff an opportunity to present his grievance to him, but Plaintiff never responded to him.[29] (PX13; Pl. 163, 166).  Wilson also reminded him that he could bring any hostile work environment complaint to Stephanie Figueroa in HR, which he did.[30] (PX13; Pl. 163, 166).  However, Plaintiff did not allege that anyone made comments based on any protected characteristic.  (PX12, PX13, Pl. 196).  Instead, his complaint was based on his assertion that he should not have to perform certain job duties and that he had a strained relationship with Fulton. (PX12, PX13, Pl. 196).  Figueroa, nonetheless, conducted an investigation of Plaintiff's complaint. (Pl. 166, 186, 195-96).

## J.  Plaintiff Reports FAA Violations as Part of His Job Duty

In March 2012, Fulton asked Plaintiff to prepare the quarterly base audit and report of deficiencies in advance of an FAA site visit.  (Pl. 148).  As a result, on April 30, 2012, Plaintiff raised, for the first time, what he asserts were FAA violations that he uncovered as part of completing this job duty in an e-mail to Wilson, Dickerson, Fulton, and Buss.  (Pl. 153, 195; PX11:13).  Plaintiff admits that he had not previously raised or reported any possible FAA

---

[29] Plaintiff initially asserted that he was filing a grievance under the CBA, but the Union declined to represent him.  (Pl. 161-62; PX12:2).  Plaintiff later clarified that he wanted to assert a grievance through the County's policy, not the CBA.  (PX12: 1; Pl. 163).  Wilson, however, explained that the County's grievance procedure was not available.  (PX13; Pl. 163).  After his termination, Plaintiff contends that he attempted to use the County's grievance procedure to challenge his termination on August 21, 2012.  (Pl. 221-22).  However, the County explained that, since his position was eliminated, this grievance procedure was not available.  (Pl. 221-22).

[30] Plaintiff asserts that he contacted Figueroa to make a hostile work environment complaint after he learned that Schiegner had reported him for violating FAA regulations related to an incident on May 5, 2012.  (Pl. 166).

violations to management or the FAA before he sent this e-mail.[31]  (Pl. 154, 195).  In this e-mail,

Plaintiff does not mention any safety or billing issues.  (PX11:3-4; Pl. 168, 223).  He also states that

"[a]s the FAA designated Check Airman, [he] is required to report these violations."  (PX11:2,4).

Plaintiff and Fulton disagreed on whether there was a violation.  (PX11: 1-2; Pl. 155-56).  Wilson

instructed Plaintiff to contact the FAA, and he did.  (Pl. 158-59, 160, 167; PX14; KD Ex. 5).  He

admits that this was the first time that he had reported any issues to the FAA.  (Pl. 195).  The FAA

inspector (Paul Kahler) concluded that, because Fulton's error was self-reported and the pilots did

not conduct any revenue flights, there was no violation from this error and there would be no fines.

(Pl. 158-59, 168, 169; Pl. Ex. 14).

## J.  Operational Issues Continue and Lead to the Suspension of MedStar

Plaintiff contends that it had taken Schiegner and Fulton too long to get the helicopter

approved for part 135 operations, which still had not been fully completed in July 2012.  (Pl. 146).

The County had devoted substantial resources, but the goal had not been reached.  (Pl. 41, 53-54).

Plaintiff also does not dispute that the anger and discord between Fulton, Buss, and the MedStar

staff had not improved since the safety stand down.  (Pl. 139, 141, PX12:3).  Plaintiff admits that he

and Fulton were not getting along.  (Pl. 253-55).  Indeed, on March 23, 2012, Fulton specifically

reported to Dickerson that the anger with the MedStar staff was at the same level as before the

safety stand down.  (KD Ex. 4).  In addition, in May 2012, a dispute arose between Plaintiff and

Schiegner regarding an incident on May 5, 2012.[32]  (Pl. 174, 178, 183-84; PX16).  Plaintiff does not

know if Schneiger contacted the FAA to discuss this incident.[33]  (Pl. 176).  Plaintiff was placed on

---

[31] In raising these issues, Plaintiff contends that he was only "trying to do what [Fulton] needed me to do."  (Pl. 157).

[32] Plaintiff contends that Schiegner made this complaint to keep Fulton's "hands clean."  (Pl. 175).  However, he admits that he does not have personal knowledge to support this accusation.  (Pl. 175-76).  In addition, he also contends that Schiegner had a "temper tantrum" over this incident.  (Pl. 183-84).

[33] Plaintiff contends that, after his termination, Kahler told him that Wilson and others had reported the May 5th incident to the FAA.  (Pl. 246).  However, Plaintiff admits that he does not have any personal knowledge of this report, and this assertion is based on inadmissible hearsay.  (Pl. 246-47).  Indeed, when Plaintiff made a FOIA request to the FAA, he did not receive any documents related to any investigation of him or any complaint made by the County about Plaintiff.

paid administrative leave on May 10, 2012, so that an investigation could be conducted into Schiegner's complaint that Plaintiff had violated FAA regulations and endangered the safety of the crew during a flight on May 5, 2012.[34]   (Pl. 166, 167, 170; KD ¶ 24).   Another operational issue arose when the County terminated Buss,[35] as it needed FAA approval to operate because the FAA required the positions of chief pilot and director of operations to be split.   (PX17; Pl. 187, 189).   In addition, the County continued to have difficulty in its relationship with the FAA and getting approval for its operational requests.   (PX17; PX18).   Thus, the issues continued to escalate, including arguments among the MedStar staff, continuation of bickering, angry, and disgruntled behaviors that jeopardized the safe operations of MedStar, and several operational issues central to the continuation of the program.

By April 20, 2012, Public Safety management along with HR and the County Attorney's Office started to have discussions about whether and how to proceed with the program.   (KD ¶ 27).   Through these discussions and conducting a review of the program, it was clear that the safety stand down had failed to reset the program, and the safe operations of MedStar were, once again, in jeopardy.   (KD ¶ 27).   The conversations between Public Safety management, HR, County Administration, and the County Attorney's Office resulted in a recommendation on August 1, 2012, to terminate Fulton, suspend the MedStar program, and eliminate the pilot positions.   (KD ¶ 28).   They concluded that this recommendation was the only way to ensure the safety of the MedStar

---

(Pl. 248-49).   Plaintiff contends that the FAA destroyed the records, although he admittedly does not have knowledge to support this accusation.   (Pl. 248).   Plaintiff confirms that the FAA never took any action against him as a result of the May 5th incident.   (Pl. 246-48).

[34] Plaintiff contends that these allegations are false, although he acknowledged Schiegner's right to report his belief that Plaintiff committed these violations.   (Pl. 169-170, 214).   This investigation continued and Plaintiff remained on paid administrative leave until August 21, 2012.   (KD ¶ 25; Pl. 190).   Plaintiff was never disciplined for this incident.   (KD ¶ 25).   Schiegner continued to remain a County employee after the Medstar suspension.   (Pl. 213-14).

[35] Plaintiff does not contend that Buss ever engaged in any protected activity.   (Pl. 251-52).   After Buss was terminated, Plaintiff called him and spoke to him about his termination.   (Pl. 251).   Plaintiff contends that Buss "apologized for his part in trying to come up with a reason to fire me.   He told me from the day he got there he was told to get something on me to fire me and he said I don't like admitting it, I'm not proud of it."   (Pl. 251).   As an initial matter, these statements are inadmissible hearsay.   Moreover, they belie any claim of retaliation as Plaintiff admittedly did not engage in any protected activity prior to Buss's employment.   (Pl. 251-52).

employees and the County's citizens.   (Id.).   The County Manager made the final decision to suspend MedStar, effective August 21, 2012.  (KD ¶ 29).  During these conversations, including the meeting on August 1, 2012, there was no mention or discussion regarding any complaints or other alleged protected activity.  (KD ¶¶ 28-29).

On August 21, 2012,[36] the pilots met with Wilson, Dickerson, Christine Brady, and a union representative.  (Pl. 197; KD ¶ 31).  Wilson told them that Fulton had been terminated.[37]  (Pl. 197-98).  He then explained the pilots that they were being terminated as well, and that the Medstar program was being suspended.  (Pl. 198).  Plaintiff then asked if the pilots were going to be reassigned to a ground ambulance crew, and Wilson said that they would not.[38]  (Pl. 199).  All of the pilots, including Plaintiff, were given paperwork at the meeting explaining their separation of employment.[39]  (Pl. 202).  After the Medstar program was suspended on August 21, 2012, it was not resumed and the pilot positions were never posted or filled.  (Pl. 207-08, 209-210, 211).  Since August 21, 2012, the County has not hired one pilot.[40]  (Pl. 211).   Plaintiff admits that he did not speak to the press, participating in the Clerk's audit, or meet with the FAA until after his employment was terminated.  (Pl. 208, 221, 246).

## II.    Legal Argument

---

[36] A few days before this decision was communicated, one of the flight paramedics (Danielle Bobzien) expressed her fear of flying with the MedStar program based on some incidents that have occurred in the cockpit.  (KD ¶ 30).  She also reported that the environment among the pilots was a "mess" and that she feared for her safety.  (Id.)

[37] Plaintiff asked why Fulton was terminated, but Wilson declined to get into it.  (Pl. 198).  Plaintiff admits that he argued with Wilson over his question.  (Pl. 198-99).

[38] Plaintiff contends that this reassignment was required by the CBA, but neither Plaintiff nor the Union filed a grievance over Wilson's decision not to reassign the pilots.  (Pl. 199, 202; KD ¶ 33).  In addition, there was a union representative present in this meeting, and he did not raise any objection.  (Pl. 203).  Furthermore, all of the pilots were told the same information that they would not be reassigned to an EMT position.  (Pl. 205-06).  However, Plaintiff does not contend that McFarlane or Edmonson ever engaged in any protected activity.  (Pl. 206-07).

[39] The letter indicated that Plaintiff's employment was eliminated due to a shutdown of the program.  (PX19:1).  Plaintiff also received a packet of information, as referenced in the letter, "containing information on your benefits, the employee assistance program, training classes, unemployment compensation and other re-employment services."  (PX19: 1; Pl. 205).  Part of this information included "Frequently Asked Questions" along with the HR telephone number.  (PX20: 4).  This information provided: "What if I would like to apply for another position in Lee County?  You are able to apply for any position posted on our website.  Workstations are available to you in the Human Resources Department."  (PX20: 5).  It also identified the website where it positions are posted.  (PX20: 7).

[40] After his termination, Plaintiff filed a complaint with OSHA alleging that he had been terminated for reporting violations of the FAA regulations, which was dismissed and upheld on appeal  (Pl. 248, 249).

### A.  Plaintiff's First Amendment Claim Fails as a Matter of Law

While Plaintiff generally alleges that he engaged in protected speech, he does not identify that speech with any particularity.  (Pl. Ans. 1, 12).  Instead, he vaguely contends that, throughout his employment, he engaged in protected speech.  (Id.).  Despite his vague allegations, in his deposition, Plaintiff made several admissions regarding his speech.  First, Plaintiff admits that he did not speak to the press about any matter involved MedStar until after his termination.  Next, he admits that he did not speak to the Clerk's Office regarding their audit of MedStar until after his termination.  Further, he concedes that he only spoke to the FAA one time prior to August 21, 2012, when he sent an e-mail to the FAA Inspector Kahler on May 2, 2012.  Plaintiff also admits that he only complained about FAA violations to management one time on April 30, 2012.  Finally, Plaintiff admits that he did not have knowledge of the County's billing and therefore never complained that the County was billing fraudulently or illegally.  Plaintiff has not identified any complaint about safety violations, fraudulent billing, or any other protected matter.  (Pl. Ans. 12).

### 1.  Plaintiff Cannot Establish a Basis for Municipal Liability

As an initial matter, Plaintiff cannot establish a basis for municipal liability.  It is well settled that a municipality cannot be held liable under a theory of respondeat superior and can only be held liable when an injury is inflicted by a policy, custom or practice, or final policy maker.  City of St. Louis v. Praprotnik, 485 U.S. 112, 121-22 (1988) (plurality opinion).  Plaintiff has filed to identify any policy, custom, practice, or final policy decisionmaker.  (Pl. Ans. 6).  Assuming for purposes of this motion that Hawes was a final policy maker, there is no evidence that she had knowledge of Plaintiff's alleged protected activity or ratified any decision based on retaliatory intent.  Thus, Plaintiff cannot establish a basis for municipal liability.  Praprotnik, 485 U.S. at 127; Matthews v. Columbia County, 294 F.3d 1294, 1297 (11th Cir. 2002); Gattis v. Brice, 136 F.3d 724, 727 (11th Cir. 1998).

### 2.  Legal Standard for First Amendment Protection

Although a public employee does not lose his First Amendment right to speak as a citizen on a matter of public concern by virtue of his or her employment, the United States Supreme Court equally has recognized that this protection is limited in the public employment context.  Alves v. Bd. of Regents of the Univ. Sys. of Georgia, 804 F.3d 1149, 1159 (11th Cir. 2015).  In determining whether a public employee's speech is protected, the court must engage in a two-step inquiry.  First, it must determine "whether the employee spoke as a citizen on a matter of public concern."  Id. Thus, Plaintiff must establish both that he spoke as a citizen[41] and on a matter of public concern.[42] Id. at 1160.  Then the court considers "whether the relevant government entity had an adequate justification for treating the employee differently than any other member of the general public [based on the government's interests as an employer]."[43]  Id.  Both of these steps are questions of law.  Id.  This standard ensures that it does not constitutionalize employee grievances.  Id. at 1160.

### 3.  Plaintiff Cannot Establish that There is Protected Activity

Plaintiff has the burden to establish that he engaged in protected activity.  He cannot do so in this case.  In particular, he has not even identified the protected activity with any reasonable

---

[41] With respect to the citizen requirement, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Garcetti, 547 U.S. at 421. The central inquiry under this citizen requirement is "whether the speech at issue 'owes its existence' to the employee's professional responsibilities."  Alves, 804 F.3d at 1161 (noting that "the 'controlling factor' is whether the employee's statements or expressions were made 'pursuant to his official duties'"); see also Lane v. Franks, 134 S. Ct. 2369, 2379 (2014).

[42] In deciding whether the speech involves a matter of public concern, "an employee's speech must relate to 'any matter of political, social, or other concern to the community."  Alves, 804 F.3d at 1162.  In evaluating this issue, the content, form, and context of the employee's speech must be considered.  See id.  "If the relevant speech was motivated by personal concerns instead of public concerns then it is not protected by the First Amendment in this context."  Johnson v. Clifton, 74 F.3d 1087, 1092 (11th Cir. 1996).

[43] In balancing the interests of the employee and the employer, the United States Supreme Court has defined the court's task at this stage of the analysis as "to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  Connick v. Myers, 461 U.S. 138, 143 (1983).  In developing this balancing test, the Supreme Court recognized that public employers must have "the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch."  Id. at 151.  The Constitution does not require that the public employer actually wait until the employee's speech disrupts the office or disintegrates relationships before it is permitted to act.  Id. at 152.  As a result, the scales may tip in favor of the public employer when the employer has a reasonable belief that the employee's speech "would disrupt the office, undermine his authority, and destroy close working relationships."  Id. at 154.

particularity.  (Pl. Ans. 2).  Even reading these general allegation in the light most favorable to Plaintiff, Plaintiff still cannot establish protected activity. (Pl. Ans. 2).

**Plaintiff's participation in pilot meetings is not protected.**  The pilots and paramedics were expect to raise safety and other issues as part of their job duties.  (Pl. 68-69; PX1).  And they also were expected to attend and participate in pilot meetings as part of their job duties.  (KD ¶ 16).  Plaintiff acknowledged that he had been trained by the County, throughout his employment, that he was expected to raise issues and concerns to management.  (PX1).  Thus, Plaintiff was not acting as a citizen when he was speaking during the pilots meetings.  Instead, it was part of his job duties to do so.  In addition, as evidenced by Plaintiff's May 8, 2011, e-mail the issues raised in these meetings were not matters of public concern.  The use of CRM and the pilots in the cockpit were issues personal to Plaintiff, not a matter of political, social, or other concern to the community.  In addition, as Plaintiff confirmed, his concern was not the implementation of these policies, but that they were implemented without prior discussion with the pilots, which is only a personal concern.

**Plaintiff's participation in safety stand down meetings is not protected.**  Likewise, Plaintiff's statements during the safety stand down meetings are not protected activity under the First Amendment.  Plaintiff admits that he was required to participate in these meetings as part of his job duties, and this speech owes its existence to Plaintiff's job duties.  In addition, Plaintiff's statements about management are not issues of public concern.  Instead, it reflects his personal dispute with the MedStar management regarding their operations.

**Plaintiff's grievance and complaints about performing his job duties are not protected.**  Throughout his employment, Plaintiff complained about the assignment of the company instructor and FAA-designated check airman duties. (Pl. 115-17, 119, 140).  These complaints were not made as a citizen, but because Plaintiff's did not want to perform these job duties and asserted they were assigned in violation of the CBA.  Thus, this speech is not protected.  Moreover, this speech was not

17

on a matter of public concern.  Instead, it was a matter of private concern.  Thus, it is not protected by the First Amendment.  Boyce v. Andrew, 510 F.3d 1333, 1344 (11th Cir. 2007).

**Plaintiff's statement about the FAA requirements for revenue flights is not protected activity.**  Plaintiff admits that he never complained that the County was improperly billing.  Instead, he contends that, in pilot meetings, he explained the FAA requirements for conducting revenue flights.  He explains that this was part of his duties as the company instructor.  Plaintiff's guidance on what the FAA regulations provide is not protected activity under the First Amendment.  He is providing this information as part of his job duties, not as a citizen.  Further, this speech is not on a matter of public concern, because Plaintiff never complained about improper billing.  Educating his coworkers and management on the regulations is not speaking on a matter of public concern.

**Plaintiff's e-mail to management and the FAA regarding possible FAA violations is not protected activity.**  On April 30, 2012, Plaintiff raised, for the first time, a report of possible FAA violations.  Plaintiff admits that he discovered these violations when he was preparing a base audit as he was instructed to do.  He also admits that he was instructed to create a report of the deficiencies that he found during this audit.  In the e-mail to management, he explained that this statement was part of his FAA check airman report.  Thus, in sending the e-mail to management, he was not acting as a citizen, but making a statement as part of his job duties.  Likewise, Plaintiff expressly acknowledges that his report to the FAA was part of his FAA-designated check airman duties, and he admits that Wilson instructed him to make this report.  Thus, the e-mail to management and subsequent report to the FAA were speech made in the course of Plaintiff's performance of his job duties and thus are not protected by the First Amendment.  Moreover, this speech is not on a matter of public concern.  Plaintiff reports that Fulton had signed off on the training for two pilots for the BO105 when he (Fulton) was not the company instructor.[44]  (Pl. 153,

---

[44] Plaintiff, the company instructor for the BO105, was on vacation during this time.  (Pl. 153; PX11:3).

168; PX11:3).  Thereafter, the two pilots successfully completed their checkrides with the FAA. (Id.).  Under the FAA regulations, they would have to re-do the checkrides once the appropriate instructors signed off on their training.  (Id.).  However, this issue was not a safety concern, as the pilots had completed the training and successfully passed the checkrides with the FAA.  Indeed, Plaintiff did not characterize it as a safety concern in his e-mail.  (PX11:3-4).  Thus, this was not a matter of public concern.  Boyce, 510 F.3d at 1343-46.

**Plaintiff's hostile work environment complaint is not protected activity.**  Plaintiff contends that he reported a "hostile work environment."  He does not contend that the hostile work environment was because of any protected characteristic.  Wilson specifically instructed Plaintiff to bring this complaint to HR if he wanted to pursue it.  Thus, Plaintiff was making this complaint in the course of performing his job duties.  Moreover, this complaint is not a matter of public concern.  Indeed, Plaintiff admitted that he was complaining about issues personally related to him. (PX12:3).  Therefore, he was not reporting a matter of public concern.[45]

### 4.  Elimination of the Pilot Positions Was the Only Adverse Employment Action

"'To be considered an adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of employment.'"  Akins v. Fulton County, Ga., 420 F.3d 1293, 1300 (11th Cir. 2005).  In addition, the action must be "likely [to] chill the exercise of constitutionally protected speech.  Id.  Thus, the Eleventh Circuit has held that "unwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of the contracting division, threat of suspension without pay, exclusion from meetings, [and] removal of job duties" were not adverse employment actions.  Akins, 420 F.3d at 1301.

Plaintiff contends that he suffered an adverse employment action when he was placed on

---

[45] Even if Plaintiff could establish that he spoke as a citizen on a matter of public concern, Plaintiff's claim still fails because, given the content,  context, and manner of the speech, as discussed supra, Defendant's interests in promoting the efficiency of public services far outweighs any minimal interest that Plaintiff may have speak on these topics.  See Connick, 461 U.S. at 143; Oladeinde v. Birmingham, 230 F.3d 1275, 1293 (11th Cir. 2000).

administrative leave during the County's investigation of his conduct on May 5, 2012.  (Pl. Ans. 3).

Plaintiff received his regular pay and benefits during this administrative leave.  (KD ¶ 22).  Thus,

this administrative leave was not an adverse employment action.  <u>Moore v. Miami-Dade County</u>,

2005 WL 3273722, at *11 (S.D. Fla. 2005).[46]  Plaintiff claims that he lost the potential for overtime

pay during this paid administrative leave.  However, there was no guarantee of overtime, which is

confirmed in the CBA between the County and the Union.  (KD Ex. 8).  In addition, Plaintiff has

not made any attempt to quantify the overtime or even establish that such overtime was, in fact,

available during this period of time.  (Pl. Discl. 3, Pl. Ans. 3, 9).  He makes no attempt to establish

how much overtime was available, if any, during his leave or that he would have been awarded it.

(Pl. Discl. 3; Pl. Ans. 3; KD Ex. 8).  Furthermore, there is no evidence that the County denied

Plaintiff this alleged overtime. He never requested overtime compensation during his administrative

leave and thus the County never denied his request.  (KD ¶ 22, 24).  Thus, Plaintiff's administrative

leave, including his alleged loss of overtime, is not an adverse employment action.  <u>Moore</u>, 2005

WL 3273722, at *11; <u>Collins v. Miami-Dade County</u>, 361 F. Supp. 2d 1362, 1373 (S.D. Fla. 2005).

Plaintiff also asserts that investigations into his conduct immediately following the safety

stand down and related to the May 5, 2012, incident were adverse employment actions.  (Pl. Ans.

3).  However, an investigation is not an adverse employment action.  <u>Benningfield</u>, 157 F.3d at 376;

<u>Rademakers v. Scott</u>, 2:07-CV-718, 2009 WL 3459196, at *2 (M.D. Fla. 2009) <u>aff'd</u>, 350 F. App'x

---

[46] Plaintiff also appears to contend that the first administrative leave for the fitness-for-duty examination also was an adverse employment action.  (Pl. Ans. 3).  This assertion fails for the same reasons.  There was no tangible harm to Plaintiff.  Indeed, he has never quantified any such loss.  (Pl. Discl. 3; Pl. Ans. 9).  In addition, Plaintiff has described his relationship with Dr. Bushman, who conducted the fitness-for-duty examination, as a benefit, not a detriment.  (Pl. 258-59).  Furthermore, the County had the right to require a fitness-for-duty examination under the Americans with Disabilities Act. (KD ¶ 21); <u>Owusu-Ansah v. Coca-Cola Co.</u>, 715 F.3d 1306, 1312 (11th Cir. 2013).  Plaintiff has never filed any charge of discrimination challenging this fitness-for duty evaluation.  Moreover, once Dr. Bushman opined that Plaintiff was fit for duty, he was returned to work.  Thus, paid administrative leave while Plaintiff completed a fitness-for-duty examination is not an adverse employment action.  <u>See</u> <u>Benningfield v. City of Houston</u>, 157 F.3d 369, 376 (5th Cir. 1998); <u>Wells v. Gates</u>, 336 F. App'x 378, 383-84 (4th Cir. 2009); <u>Giang v. Potter</u>, 369 F. Supp. 2d 763, 769 (E.D. Va. 2005).  In addition to the lack of any harm, prior to this administrative leave, Plaintiff had not engaged in any protected activity.

408 (11th Cir. 2009).   Indeed, with respect to the May 5, 2012, incident, Plaintiff was not

disciplined.   (KD ¶ 25).   Likewise, with respect to the investigation conducted after the safety stand

down, Plaintiff cannot point to any discipline resulting from this investigation.   Thus, Plaintiff

cannot establish that these investigations were adverse employment actions.

Plaintiff also contends that his placement on the original and revised PIPs were adverse

employment actions.   (Pl. Ans. 3).   The PIPs did not lead to any tangible harm.   Indeed, Plaintiff has

not identified any such harm or that the PIPs resulted in a serious and material change in the terms

and condition of his employment.[47] (Pl. Discl. 3; Pl. Ans. 9).   Plaintiff cannot adduce any evidence

that the PIPs required him to perform additional job duties.   (PX 5; PX 15).   The PIPs also had no

impact on his pay, benefits, or employment status.   Thus, the PIPs were not adverse employment

actions.   Redd v. United Parcel Serv., Inc., 615 F. App'x 598, 603-04 (11th Cir. 2015); Jarvis v.

Siemens Med. Sols. USA, Inc., 460 Fed. Appx. 851, 859 (11th Cir. 2012); Wallace v. Georgia Dept.

of Transp., 212 F. App'x 799, 801 (11th Cir. 2006).

Plaintiff also attempts to point to a number of incidents after his termination that he

purportedly contends were adverse employment action.   (Pl. Ans. 3).   However, none of these

assertions amount to an adverse employment action.   For example, Plaintiff contends that he was

not permitted to use the County's grievance process to grieve the elimination of his position.   This

was true for all of the pilots, and Plaintiff has not identified any tangible harm resulting from this

determination.   Furthermore, Plaintiff contends that Holly Schwartz made false statements about

him after his termination to a member of the public.   However, Plaintiff has not identified any

tangible harm that he suffered from these conversations.   In fact, he does not identify with any

specificity the statements made or how they were false.   (Pl. Ans. 3).   Moreover, it cannot be

disputed that "criticism, ridicule, and other derogatory remarks by coworkers and supervisors do not

---

[47] Indeed, according to Plaintiff, he did not view the revised PIP on May 9, 2012, as changing anything.  (Pl. 173).

constitute adverse employment actions."  <u>Moore</u>, 2005 WL 3273722, at *12 (S.D. Fla. 2005).

Although Plaintiff does not allege any other adverse actions, Plaintiff may argue that the denial of his request for the pilots to be transferred after MedStar was suspended is an adverse employment action.  At the meeting on August 21, 2012, Plaintiff contends that he requested that the pilots be transferred to EMT positions on the ground ambulance and that request was denied. (Pl. 199, 205-06).  Unlike the paramedics, the pilots had not received their EMT credentials from the County's medical director.  Thus, they were not qualified to serve as EMTs on the ground ambulance.  Plaintiff admits that he was not qualified to drive an ambulance.

Plaintiff does not contend that he requested to apply for an EMT position or that he was told that he could not apply for any such vacant position within the County.  (Pl. 199, 205-06).  Indeed, in the written packet provided to him on August 21, 2012, the County specifically invited him to review the County's vacancies and apply for any open position.  (PX20).  He also does not contend that he applied for an EMT position and his application was denied.  (Pl. 199, 205-06).  In addition, Plaintiff does not identify that the denial of his request to transfer to an EMT position was an adverse employment action.  (Pl. Ans. 3). Nor does he assert that this is the basis for any claim that he has made in this lawsuit.  (Pl. Ans. 2).  Furthermore, the denial of his transfer request cannot be the basis of any claim of retaliation because, according to Plaintiff, the County denied the request with regard to all pilots, including those who Plaintiff does not contend engaged in any protected activity. (Pl. 199, 205-07).

Therefore, as the foregoing demonstrates, the only adverse employment action taken against Plaintiff was the elimination of his employment on August 21, 2012.[48]

---

[48] Although Plaintiff contends that Wilson intended to re-start the program at a later date and hire new pilots when the program was suspended on August 21, 2012, it is undisputed that the County never hired another pilot in the Department of Public Safety.  (Pl. 207-08, 209-210, 211).  Instead, the Board made a decision to enter into a public-private partnership where a private entity operated the helicopter.  Plaintiff concedes that the County Commissioners are elected to make these decisions, and, as a matter of law, they did make this decision as they believed it was in the best interest of the County.  (Pl. 212).  At the time that the program was suspended, the public-private partnership was one of

### 5.  No Causal Connection or Pretext for Retaliation

In order to establish a claim of retaliation, the plaintiff must show a causal connection between his protected activity and the adverse employment action.  Manley v. Paynter, 4:07CV392-WS, 2009 WL 2489229, at *3 (N.D. Fla. 2009).  Here, Plaintiff cannot provide any such evidence.  Plaintiff does not allege that anyone made any negative or derogatory remarks about Plaintiff's alleged protected activity.  Moreover, there are numerous examples of other County employees who did not engage in protected activity but were nonetheless terminated.[49]  Likewise, the other two pilots had their positions eliminated at the same time, and there is no suggestion that they engaged in protected activity.  In addition, the County did not rehire any pilots.  Furthermore, the entire program was shutdown, which impacted numerous employees, including all of the flight paramedics.[50] Thus, Plaintiff simply cannot show any evidence of disparate treatment or retaliation in the decision to eliminate his position, along with many others, when the program was shutdown.[51]

Furthermore, the decision to suspend the MedStar program and eliminate the pilot positions was not made overnight, but was the result of a deliberative process.  By April 20, 2012, it was clear that the safety stand down had failed to achieve its purpose of resetting the program to focus on

---

the methods to be considered in determining how to move forward with a County air ambulance service.  (KD ¶ 34).  Plaintiff does not contend that the Board's decision to terminate the MedStar program permanently or enter into a public-private partnership is an adverse employment action.  (Pl. Ans. 3).   Even if Plaintiff were to make such an assertion at this time, which the Court should not permit, there is no evidence that this decision was an adverse employment action or that it could support Plaintiff's claim of retaliation.  Indeed, like Plaintiff, none of the other pilots were rehired as the County never posted or filled a pilot position again after August 21, 2012.  (Pl. 211).

[49] Likewise, Plaintiff identified one person who complained to the FAA and was never disciplined.  According to Plaintiff, prior to August 2009, someone had reported him to the FAA because he was allowing a paramedic to sit and handle the controls of the EC145.  (Pl. 79-80).  Plaintiff, however, does not contend that this person suffered any type of adverse employment action for this report.  (Pl. 80).

[50] Moreover, the flight paramedics complained vociferously about this decision both privately and publicly.  (KD ¶ 32).  For the paramedics, the MedStar assignment provided them with a favorable schedule, job duties, and use of seniority.  (Id.).  Despite these complaints, the flight paramedics maintained their jobs with the County.  (Id.).

[51] Moreover, if Wilson, Dickerson, or anyone in County Administration had a retaliatory intent against McAllister, they had numerous opportunities to terminate his employment.  For example, they could have terminated McAllister instead of placing him on a performance improvement plan on October 11, 2011.  In addition, when he was not satisfactorily performing under that plan, they could have terminated him, but instead they attempted to coach him to perform.  They only terminated him when they had no choice because the MedStar program was suspended and all of the pilot positions were being eliminated.  Thus, there is no evidence of retaliatory intent.

safety.[52]   Thus, well before Plaintiff made his report of FAA violations to management and the FAA, discussions were ongoing about whether and how to move forward with the MedStar program, which eliminates any claim of causation based on temporal proximity.  Castillo v. Roche Labs., Inc., 467 F. App'x 859, 863-64 (11th Cir. 2012).  Ultimately, the issues continued to escalate, including continued arguments among the MedStar staff, demonstration of bickering, angry, and disgruntled behaviors that jeopardized the safe operations of MedStar, and several operational issues, and it was clear that the only way to ensure the safety of the MedStar employees and the County's citizens was to suspend the program.  Plaintiff cannot dispute these facts.

Finally, Plaintiff also cannot dispute that the reason for his termination – the County's reduction-in-force due to the suspension of the Medstar program – was the real reason for his termination.  The County did, in fact, engage in a reduction-in-force and all of the individuals who held his same title were terminated.  The County could not have continued to employ him in that position because it was, in fact, eliminated.  There is no evidence that the County later revived the position in any way.  Although Plaintiff may quibble with the County's decision to shutdown the Medstar program (Pl. 212), his attempt to challenge that decision and the County's business judgment is not sufficient to state a claim of retaliation.  Indeed, an independent investigation and audit by the Lee County Clerk's Office, after the suspension of the program, confirmed that the reasons for the shutdown were completely unrelated to any purported protected activity engaged in by Plaintiff.  (KD Ex. 7).  Plaintiff has not and cannot adduce any evidence to suggest that the shutdown of the MedStar program was related to Plaintiff's alleged protected activity.

### B.  Plaintiff's FCA Claim Fails as a Matter of Law

In order to state a claim under the FCA, Plaintiff must establish that he engaged in protected conduct and the County retaliated against him because of it.  Mack v. Augusta-Richmond County,

---

[52] Indeed, on March 23, 2012, Fulton informed Dickerson that "the temperature here is swiftly rising to its position on the anger scale of last August on both sides of MEDSTAR, I believe."  (KD Ex. 4).

Ga., 148 F. App'x 894, 896-97 (11th Cir. 2005).  To engage in protected conduct, Plaintiff must show that he filed an FCA claim or his actions were "sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a qui tam action by the employee." U.S. ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1304 (11th Cir. 2010).  Plaintiff cannot establish that he engaged in protected conduct.  Indeed, he admits that he never made any complaint about billing or any allegation that the County was committing a fraud on the government.  Instead, he asserts that he provided guidance on the requirements for revenue flights and that expressed a concern that the County might bill for Bell 430 flights.  However, this is not protected activity under the FCA.  U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 (11th Cir. 2002) (finding that it is not sufficient to offer mere conjecture that an improper claim may occur in the future under the FCA).  At best, Plaintiff's statements regarding the County's billing constitute conjecture.  Furthermore, it cannot be disputed that the billing issue occurred as a result of an innocent mistake based on a miscommunication, which are not actionable under the FCA.  Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1058 (11th Cir. 2015).[53]

## **CONCLUSION**

Defendant respectfully requests that this Court enter judgment in its favor.

---

[53] Moreover, the requirement to maintain the appropriate FAA certification is a condition of participation, not a condition of payment, for Medicaid and Medicare.  As a result, it cannot be the basis of any claim under the False Claim Act.  U.S. ex rel. Wall v. Vista Hospice Care, Inc., 778 F. Supp. 2d 709, 720 (N.D. Tex. 2011); see also U.S. ex rel. Clausen, 290 F.3d at 1311 ("The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe.").

Dated this 22nd day of April, 2016.

Respectfully submitted,

*s/Sacha Dyson*
SACHA DYSON
Florida Bar No. 509191
sdyson@tsghlaw.com
GREGORY A. HEARING
Florida Bar No. 817790
ghearing@tsghlaw.com
Thompson, Sizemore, Gonzalez,
  & Hearing, P.A.
One Tampa City Center
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically

filed, on this 22nd day of April, 2016, with the Clerk of the Court by using the CM/ECF system and

for service upon:

Benjamin H. Yormak
Yormak Disability Law Group
9990 Coconut Road, Suite 206
Bonita Springs, Florida 34135
byormak@yormaklaw.com
Attorney for Plaintiff

*s/Sacha Dyson*
Attorney